United States District Court
District Of Maine

John Doe, M.D.,

      Plaintiff,

    v.

MaineGeneral Medical Center,

Radiation Oncology Associates, P.A.,

and Glenn A. Healey, M.D.,

      Defendants.

Civil Action No.

## Complaint for Race Discrimination and Other Civil Rights Violations; Injunctive Relief Sought; and Demand for Jury Trial

Dr. John Doe complains against MaineGeneral Medical Center (MGMC), Radiation Oncology Associates, P.A. (ROA), and Glenn A. Healey, M.D. (all three referred to collectively as "Joint Employer") as follows:

### Summary of Action

1.    Dr. John Doe is a person of color who was born in Asia to non-white parents. After moving to the US as a child, he graduated magna cum laude and with highest honors from Harvard College and received his medical training at Dartmouth and Yale.

2.      Beginning in 1997, Dr. Doe had a stellar record as a radiation oncologist. From 2007 until 2018, he worked at a 326-bed hospital in Ohio where he served as the Medical Staff President, Chairman of the Medical Executive Committee, and Chairman of the Radiation Oncology Department.

3.      In June 2018, Dr. Doe began working at the MaineGeneral Harold Alfond Center for Cancer Care (HACCC or Alfond Center) in Augusta, Maine at MGMC. He earned highly favorable ratings from his patients about the quality of his care, scoring well above the average.

4.      Throughout Dr. Doe's employment at MGMC, he faced disparaging comments, abusive treatment, and negative assumptions about his education, training, skills, and experience. This hostile work environment arose from false stereotypes triggered by his race, ancestry, ethnic characteristics, and foreign name.

5.      During his employment at MGMC, Dr. Doe reported and opposed out-of-date and unsafe medical practices and conditions at the Alfond Center that resulted in death and serious injuries that were preventable.

6.      Because of the severe and pervasive harassment in his hostile and abusive work environment, Dr. Doe was forced to give his notice of resignation in April 2019. At the request of his Joint Employer, he agreed to delay the effective date of his resignation until October 18, 2019.

7.     Because of his race and his whistleblowing reports opposing and reporting race discrimination and unsafe practices and conditions, on August 19, 2019, MGMC abruptly ordered Dr. Doe to stop working, and the next day it permanently banned him from coming on the hospital premises without a security escort. The decision to bar him from the hospital effectively took away his hospital medical staff privileges at MGMC in violation of the legally binding rules requiring due process for taking away such privileges.

8.     MGMC took these unusually severe actions against Dr. Doe based on a vague complaint by a white MGMC employee, without giving Dr. Doe any opportunity to respond to the complaint. The complainant reported concerns based on a brief portion of a workplace conversation when the complainant was admittedly unsure whether Dr. Doe was joking. And the complainant reported being alarmed by the "crazy look" in Dr. Doe's eyes and because "he comes to work with a lot of bags, what are in those bags?" The complainant did not report any concerns based on the actual content of the bags Dr. Doe carried, nor did she have any basis to do so.

9.     The obvious race discrimination and whistleblower retaliation reflected in MGMC's disproportionately severe response to this complaint against Dr. Doe is proven by MGMC's strikingly more lenient treatment of other doctors who have been the subject of equally or more serious complaints. For example, in 2020 and 2021, at least six medical staff

members, including other doctors, reported serious concerns about Dr. Ian

Reight's treatment of female staff—such as making "vulgar statements" and

fostering a "degenerative culture"—and his unsafe care for patients—

including refusing to come into the hospital while on call to evaluate

seriously ill patients leading to their death or risk of death. Instead of

disciplining Dr. Reight for these complaint, MGMC's top management took

no corrective actions but instead made him the Vice President and then the

President of the Medical Staff, thereby installing him on the Board of

Directors of MGMC's parent organization, MaineGeneral Health.[1]

## Parties

10.     Plaintiff, Dr. John Doe, is a citizen of the United States and

currently lives and works outside of Maine. This Complaint uses a

pseudonym for the name of the Plaintiff  because he "reasonably fears that

coming out of the shadows will cause him unusually severe harm" to his

professional reputation, and forcing him to disclose his name publicly could

deter, "to an unacceptable degree, similarly situated individuals from

litigating," including cases in which "the injury litigated against would be

---

[1] Jessica Piper and Erin Rhoda, *Maine surgeon's career advanced despite sex discrimination complaints*, Bangor Daily News (Nov. 15, 2022), available at https://www.bangordailynews.com/2022/11/15/mainefocus/mainegeneral-surgeon-sex-discrimination-investigation-joam40zk0w/.

incurred as a result of the disclosure of the [party's] identity." *Doe v. Mass. Inst. of Tech.*, 46 F.4th 61, 71 (1st Cir. 2022).

11.     Plaintiff's use of a pseudonym is also warranted because the unlawful termination of medical staff privileges was supposed to have been based on confidential procedures, and thus this case falls into the category of "suits that are bound up with a prior proceeding made confidential by law." *Id.*

12.     Given the strong public interest at stake regarding Plaintiff's claims of race discrimination and unsafe practices and conditions by the third largest hospital in Maine, a pseudonym is further justified because "the public has a substantial interest in ensuring that those who would seek justice in its courts are not scared off by the specter of destructive exposure." *Id.* at 66.

13.     Plaintiff's identity is known to all Defendants, and Plaintiff will file Plaintiff's true name under seal with the Court when proof of service of the Complaint is filed.

14.     Defendant MaineGeneral Medical Center is a non-profit corporation with an established place of business in Augusta, Kennebec County, Maine.

15.    During John Doe's employment, Defendant Radiation Oncology Associates, P.A. was an established place of business in Augusta, Kennebec County, Maine.

16.    During John Doe's employment, Defendant Glenn A. Healey, M.D. was the sole owner of Radiation Oncology Associates, P.A.

### Jury Trial Demand

17.    Plaintiff demands trial by jury on all issues triable by a jury.

### Jurisdiction and Venue

18.    This action arises under 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2000e-17 (Title VII). This Court has proper subject matter jurisdiction over Plaintiff's federal claims under 28 U.S.C. §§ 1331 (federal question) and 1343 (civil rights), and supplemental jurisdiction under 28 U.S.C. § 1367(a) over Plaintiff's state law claims under the Maine Human Rights Act (MHRA), 5 M.R.S. §§ 4551–4634, and the Maine Whistleblowers' Protection Act (MWPA), 26 M.R.S. §§ 831–840.

19.    Venue is proper in the District of Maine under 28 U.S.C. § 1391(b)(1)(2) because (1) Defendants reside in Maine; and (2) a substantial part of the events or omissions giving rise to the claim occurred in Maine. Under Rule 3(b) of the Rules of this Court, this action is properly filed in

Bangor because Kennebec County is "the county in which a substantial part of the events or omissions giving rise to the claim occurred."

## Facts

20.     Dr. John Doe is a person of color who was born in Asia to non-white parents. He moved to the United States as a child and has been a United States citizen since 1984.

21.     He graduated magna cum laude with highest honors from Harvard College.

22.     Dr. Doe received his medical degree from the Geisel School of Medicine at Dartmouth and a Ph.D. in Biomedical Engineering from Dartmouth College.

23.     He completed fellowships at Aalborg University's Institute of Electronic Systems and Yale University's Therapeutic Radiology department. Dr. Doe also completed an internal medicine internship at Yale New Haven Hospital, and a radiation oncology residency at Yale University.

24.     Dr. Doe has been a practicing, board-certified radiation oncologist since 1997, including positions at a 326-bed hospital in Ohio as the Medical Staff President, Chairman of the Medical Executive Committee, and Chairman of the Radiation Oncology Department.

**MGMC, ROA, and Dr. Healey Functioned as Dr. Doe's Joint Employer**

25.     In June 2018, Dr. Doe began work at the Alfond Center in Augusta, Maine, at MGMC.

26.     Dr. Doe's formal employer was Dr. Glenn A. Healey, who did business as ROA.

27.     ROA had a contract to provide radiation-oncology physician services to HACCC at MGMC.

28.     During Dr. Doe's employment, the MaineGeneral Health website listed ROA as one of its locations.

29.     During Dr. Doe's employment, Dr. Healey served in various positions at MGMC as a member of its Cancer Care Committee and with the official titles of (1) Cancer Conference Coordinator; (2) Cancer Committee Chair; and (3) Medical Director, Radiation Oncology.

30.     In its 2018 Annual Report, MGMC prominently and repeatedly highlighted Dr. Healey and touted Dr. Doe as part of "our superior workforce."

31.     MGMC exercised extensive control over Dr. Doe's day-to-day job performance, including supervising his daily activities; setting rules for his work and conditions of employment; dictating his work assignments; regulating how he performed work-related tasks; and ultimately ending his

employment by instructing Dr. Healey that Dr. Doe "can not work" at MGMC and barring Dr. Doe from its premises.

32.    MGMC retained for itself significant control over the essential terms and conditions of Dr. Doe's employment and functioned as his joint employer with Dr. Healey and ROA.

### Defendants Subjected Dr. Doe to a Hostile Work Environment

33.    Throughout Dr. Doe's employment at MGMC, he faced disparaging comments, abusive treatment, and negative assumptions about his education, training, skills, and experience.

34.    This hostile work environment arose from false stereotypes triggered by his race, ancestry, ethnic characteristics, and foreign name.

35.    The harassment of Dr. Doe got worse and escalated to unfair and unwarranted allegations, reprimands, demands, write-ups, disruptions of procedures, and the general undermining of his authority to do his job. For example:

a)  In July 2018, at a weekly meeting of the Radiation Oncology staff, the Chief Medical Physicist stated that he did not want Dr. Doe performing brachytherapy[2] by himself but instead wanted Dr. Healey present when Dr.

---

[2] Brachytherapy is a procedure that involves placing radioactive material inside the human body and is one type of radiation therapy used to treat cancer. As of June 2018, Dr. Doe had been performing brachytherapy for over 20 years.

Doe performed these procedures. Dr. Collins said he did not want Dr. Doe to have a "baptism by fire." The MGMC Radiation Oncology staff thus incorrectly assumed that Dr. Doe was an inexperienced and incapable radiation oncologist.

b) An MGMC staff dosimetrist commented to Dr. Doe that he must have gotten his medical education in his native country in Asia and moved to the United States at the suggestion of his father.

c) In February 2019, an MGMC manager advised Dr. Doe that an MGMC dosimetrist had made complaints to two different MGMC managers that Dr. Doe was difficult to communicate with and that he had provided the dosimetrist with inadequate instructions to prepare dosimetry plans. Dr. Doe sent an email on February 21, 2019, to an MGMC manager requesting additional information so he could follow up on these concerns. Dr. Doe never received any response to his email.

d) MGMC's Manager of Cardiology, Radiation Oncology, and Nuclear Medicine Services, Barbara Wiggin, called Dr. Doe at home after 8:00 p.m. in March 2019 to demand proof of his documentation allowing him to work in the United States. She told Dr. Doe that the visiting surveyors from the Joint Commission[3] wanted to see his "I-9 form." She said the form was to confirm

---

[3] The Joint Commission is a nonprofit organization that accredits more than 22,000 U.S. health care organizations and programs. See https://www.jointcommission.org/about-us/facts-about-the-joint-commission/joint-commission-faqs/. Joint Commission surveyors

his eligibility to work in the United States. Ms. Wiggin would not have made this nighttime request to Dr. Doe if he were not a person of color with a foreign name. Dr. Doe later learned that the Joint Commission had not actually requested to see his I-9 form, contrary to what Ms. Wiggin told him on the phone. Moreover, Dr. Doe also learned that Ms. Wiggin did not ask Dr. Healey, who is white, for an I-9 form.

e) In March 2019, Ms. Wiggin encouraged MGMC staff to disproportionately single out Dr. Doe by filing "deviation reports" against him. These reports were used to elevate alleged "deviations" in his medical practice, which in fact were not violations of applicable guidelines or standards of care. By contrast, MGMC staff did not file deviation reports about Dr. Healey or other staff members when they actually did violate applicable guidelines or standards of care.

f) On March 12, 2019, MGMC staff prepared a frivolous deviation report about Dr. Doe for not providing a prescription that was not needed until nine days later, for a March 21 radiation procedure. By contrast, a few weeks later Dr. Healey made a major error by mixing up the left and right sides of a patient's brain for high dose radiation treatment. Dr. Healey's dictation for this patient on April 10, 2019, read, "the left cerebellum lesion,

---

visit accredited health care organizations a minimum of once every 36 months to evaluate standards compliance. *Id.* This visit is called a survey. *Id.*

the 2 right occipital lesions," while his April 17, 2019 dictation read, "right cerebellar lesion, 2 enlarging left occipital lesions." On the first day of treatment, Dr. Healey was not at work, and Dr. Doe caught and corrected this error by reviewing the patient's MRI brain images. MGMC staff did not file a deviation report about this serious mistake.

g) On March 26, 2019, Ms. Wiggin went into Dr. Doe's office and loudly and abruptly told Dr. Doe: "People are always looking for your dictations!" Ms. Wiggin's accusation did not make sense, because Dr. Doe was consistent and timely with his dictations. After this false accusation, Dr. Doe's dictation became the subject of heightened scrutiny. For example, MGMC staff began questioning his longstanding practice of beginning documentation before seeing a patient. Dr. Doe was forced to explain and justify that it was entirely proper to dictate initial notes before seeing a patient, such as documenting communications with other physician about the case and otherwise preparing for the patient visit.

h) Ms. Wiggin repeatedly micromanaged Dr. Doe's medical practice, including by forcing him to complete non-urgent paperwork before it was needed for anything related to patient care.

i) On April 24, 2019, Ms. Wiggin went into Dr. Doe's office holding paperwork and said that an important patient had called her as a "last resort" because he could not get Dr. Doe to complete paperwork. When Dr.

12

Doe explained that he had already given the patient the signed form, she accused him of lying. Dr. Doe had already called the patient and confirmed he had what he needed. Dr. Doe then called the patient against in the presence of Ms. Wiggin, and the patient denied having called her as Ms. Wiggin had claimed.

36.     On April 19, 2019, Dr. Doe emailed MaineGeneral Health Chief Medical Officer Dr. Steven Diaz and MGMC Chief Medical Officer Dr. Andrew Dionne to let them know that the work environment at HACCC had become increasingly toxic, to the point that it was unhealthy, and that he would be resigning from MGMC's medical staff at a future date.

37.     Dr. Doe also notified Dr. Healey of his intent to resign. Dr. Healey asked Dr. Doe to stay on in his position for six months, until October 18, 2019.

38.     On April 22, 2019, Dr. Doe wrote to Dr. Diaz concerning the issues that led to his decision to leave MGMC's medical staff. Dr. Doe explained that he understood Ms. Wiggin to be working at the direction of Drs. Diaz and Dionne when she called him at home while he was off-duty to request his I-9 form and when she singled him out in front of staff about deviation reports.

39.     On April 24, 2019, Dr. Healey emailed Ms. Wiggin and others that Dr. Doe had given notice of resignation and would continue to work until October 18, 2019.

40.     In early May 2019, Dr. Doe applied to an open radiation oncologist position at Spectrum Health.

### Dr. Doe Blew the Whistle on Unlawful and Unsafe Medical Practices and Discrimination on the Basis of Race

41.     Over time, Dr. Doe became increasingly aware that Dr. Healey was unfamiliar with current standards of care for radiation oncologists and that he had not kept up with many major advances since Dr. Healey's medical residency in the 1990s.

42.      In about May 2019, Dr. Doe spoke with a radiation oncologist who worked in the recent past with Dr. Healey at MGMC. This oncologist said he believed Dr. Healey did not practice modern radiation oncology. He explained that he knew of numerous major medical errors by Dr. Healey, including Dr. Healey's repeated failure to insert radioactive materials deep enough into a patient's vagina during brachytherapy treatment. This oncologist told Dr. Doe that he reported these errors to MGMC.

43.     At an April 23, 2019 tumor board meeting at HACCC, a question was raised about the chances that a patient with solitary plasmacytoma of the tibia would progress to a much more serious multiple myeloma. Dr.

Healey claimed that "they all do" because, he stated, "Dick Peschel told me." Richard Peschel was a professor of Therapeutic Radiology at Yale when Dr. Healey was a resident in the early 1990s. Dr. Peschel specialized in urologic cancers (such as prostate and bladder cancer), not hematologic malignancies such as plasmacytoma. The consensus, based on literature that the Mayo Clinic published in 2017 following a comprehensive study, is that the chance of a solitary plasmacytoma involving bone only to progress to multiple myeloma is about 50%.

44.     Over time, Dr. Doe learned that Dr. Healey was treating spinal metastases with an out-of-date procedure in violation of the standard of care. He was using radiation beams that entered both the front and the back of patients, unnecessarily exposing non-cancerous organs in front of the spinal column to radiation.

45.     To avoid harming these organs, the standard of care is to use higher energy radiation coming in from the back only. Under this approach, a plan is generated, and the physician picks the radiation dose that treats the tumor (inside near the back) while mostly sparing normal organs (inside near the front and in front of the tumor near the back). Because a judgment call has to be made, it is not possible to specify the dose ahead of time. A patient of Dr. Healey developed significant side effects from Dr. Healey's improper

method and presented to Dr. Doe while Dr. Healey was not at work. This patient had to be re-treated properly.

46.     MGMC staff, having only seen patients treated from the front and from the back using Dr. Healey's improper method, reported that Dr. Doe was not treating patients properly or specifying the radiation dose ahead of time. MGMC administration, not knowing any better, believed the staff reports and consulted Dr. Healey, who stood by his outdated practice.

47.     In August 2018, Dr. Doe discovered that at MGMC, start dates for radiation—a clinical decision to be made by a physician—were instead being made by a simulation tech, a non-clinical technician who operates a CT scanner. Dr. Doe reported his concerns about this practice to Dr. Healey and MGMC staff and followed up with a written memo concerning a patient who had undergone a mastectomy in July 2018.

48.     At the end of the summer of 2018, Dr. Doe learned that the stereotactic radiosurgery process at MGMC took 21 days, when the process should in fact only take 8 hours. Dr. Doe was told that Dr. Healey then "negotiated" the 21 days down to 10 days. When Dr. Doe worked at Yale, a patient would be simulated at 7:00 a.m. after the stereotactic frame was attached to the skull with screws and be treated at 5:00 p.m., with the entire day devoted to treatment planning while the machines were busy treating

other patients. The timetable at Yale was comparable to the timeframe for similar procedures when Dr. Doe worked in Ohio.

49.     During the 10 (or 21) days this process took at the Alfond Center, on the other hand, a patient could bleed, have a seizure, or even die. MGMC staff resented Dr. Doe when he tried to bring MGMC in line with the current standard of care.

50.     On March 28, 2019, Dr. Doe notified Dr. Healey and Ms. Wiggin that he had had to correct the clinical set-up for a patient receiving electron radiation treatment for aggressive skin cancers. He asked for MGMC's policy and procedure for electron radiation treatment. There was a policy, but no procedure for implementing it. Dr. Doe's reported his concern about the lack of any procedure, and his concerns was discussed at a later department meeting. Ms. Wiggin was visibly upset with Dr. Doe's reports about this safety deficiency.

51.     To the best of Dr. Doe's knowledge, during his employment, MGMC never created a procedure to be sure electron radiation treatment was conducted safely.

52.     On May 7, 2019, while Dr. Doe was covering for Dr. Healey, he was asked to sign two electronic narcotic prescriptions (OxyContin and Percocet) for one of Dr. Healey's patients. Dr. Doe discovered that Dr. Healey had not actually seen this patient for over two years, yet Dr. Healey had

17

continued to prescribe these medications over 50 times, each time in quantities often exceeding 200 tablets.

53.    Dr. Doe refused to sign off on the prescriptions and documented in the patient's medical records his reasons for not authorizing them. Dr. Healey had to review this patient's medical record before acting on the prescription, and thus saw Dr. Doe's note documenting the violations of law and standards of care that led him to refuse to refill the prescriptions.

54.    On May 3, 2019, Dr. Healey was covering for Dr. Doe and performed brachytherapy treatment on one of Dr. Doe's patients.

55.    On May 7, 2019, MGMC staff informed Dr. Doe that the applicator carrying the radioactive isotope was not inserted deep enough into this patient.

56.    For this particular treatment, an applicator must be inserted into the patient's vagina to deliver the radioactive isotope. If the applicator is not inserted deep enough, the treatment is ineffective.

57.    Based on Dr. Doe's review of the patient's records, he agreed with the staff's conclusion that Dr. Healey had not inserted the applicator correctly, which made the treatment delivered to the patient less effective.

58.    On May 10, 2019, Dr. Doe reported his concerns to Dr. Healey about the ineffectual brachytherapy procedure on May 3. An ineffectual

brachytherapy procedure puts the health of the patient at risk because patients can only tolerate a limited number of brachytherapy treatments.

59.     On May 15, 2019, MGMC staff sent one of Dr. Doe's patients home without notifying him, despite the patient's description of constant acute pain. Dr. Doe reported this deficiency in the level of care to MGMC personnel and to Dr. Healey.

60.     In May or June 2019, Dr. Doe followed up with a physician he knew at Maine Medical Center about his application for an open radiation oncologist position at Spectrum Health. This physician was unusually tight-lipped and told Dr. Doe that they had not filled the position, and further, that they decided not to make any decisions until the following year (2020).

61.     Upon information and belief, Defendants had bad-mouthed Dr. Doe to Spectrum Health, which ended Dr. Doe's professional prospects with Spectrum Health.

62.     Shortly before June 25, 2019, when a patient was scheduled for a vaginal brachytherapy implant procedure, Dr. Doe discovered that Dr. Healey's documentation from a June 5 simulation showed that he was planning to perform an ineffectual brachytherapy procedure by using a vaginal cylinder that was too small. Dr. Doe dictated a note to that effect in the patient's file. In the note, Dr. Doe stated that he had reviewed the plan

and the American Brachytherapy Society (ABS) Guidelines with the physicist.

63.     Dr. Doe also orally reported Dr. Healey's improper plan for this procedure to the MGMC Chief Medical Physicist, the other two physicists, and several other dosimetrists, all MGMC employees.

64.     In response to Dr. Doe's note and reports, Dr. Healey changed his plan for this procedure and correctly used a larger cylinder, conforming to the standard of care.

65.     Dr. Doe later learned that before June 25, 2019, Dr. Healey had improperly performed this procedure on 11 separate patients, using cylinders that were too small to be effective, just like he had done in the June 5 simulation. In contrast, the cases Dr. Healey performed after June 25 were done properly.

66.     Dr. Doe reasonably inferred that Dr. Healey was unaware of the ABS Guidelines before June 25, 2019.

67.     At the June 13, 2019 American College of Radiology quarterly meeting at HACCC, the agenda had an item on "deviation reports," which disproportionately cited Dr. Doe. Ms. Wiggin instructed staff to "keep them coming." Obvious and blatant deviations by other physicians went unreported.

68.     During this meeting, Dr. Doe went through each "deviation report" and explained why the care delivered was appropriate for the situation. He encouraged MGMC staff to ask for clarification if they were unsure about something.

69.     Ms. Wiggin became upset and at one point said loudly: "Look at me!" which Dr. Doe did. He had been facing to the right, where most of the staff were seated, rather than the left, where Ms. Wiggin sat. During this same meeting, Dr. Healey repeatedly shushed Dr. Doe to stop talking. After the meeting, an attendee commented to Dr. Doe that Dr. Healey had been very rude to him, treating him like one of his horses.

70.     In a July 5, 2019 letter, Dr. Doe summarized his concerns to the MGMC Chief Medical Officers, Dr. Diaz and Dr. Dionne. He explained Ms. Wiggin's discriminatory treatment of him, including the overt anger she directed at him, her inexplicable late-night request for an I-9 form, aggressive follow-up on non-urgent matters, accusations that he was purposefully non-responsive, direction to staff to disproportionately file "deviation reports" about him, and presentation of these "deviation reports" at meetings as conclusive evidence of actual deviations in his medical practice.

71.     In a separate July 5, 2019 letter, Dr. Doe reported his concerns about patient safety to the Maine Board of Licensure in Medicine, as related

to Dr. Healey's narcotic prescriptions to the patient he had not seen in over two years.

72.     That same day, Dr. Healey doubled a prescription dosage for one of Dr. Doe's patients while covering for Dr. Doe. The patient was found dead at his home by Monday, July 8. Dr. Healey violated the standard of care by doubling a narcotic prescription and prescribing 96 tablets without evaluating whether the patient had been eating or drinking regularly.

73.     When Dr. Doe discussed this alarming event with Dr. Healey on July 10, 2019, Dr. Healey told Dr. Doe that it was "best to keep the coroner out of this." Dr. Doe reported this and other examples of Dr. Healey's unsafe and unprofessional conduct to the Maine Board of Licensure in Medicine.

74.     In the first week of August 2019, Dr. Healey recommended that a patient with head and neck cancer skip his final treatments. When Dr. Doe learned about this recommendation, he explained to Dr. Healey that radiobiology evidence is clear that these final few treatments are critical to the success rate of the overall treatment for such cancer. Dr. Healey responded, "don't tell me about radiobiology."

75.     Dr. Doe told Dr. Healey, both orally and in a follow-up email on the MGMC system, that he should at least document in the patient's record his recommendation about skipping the final treatments. But when Dr. Doe

checked the patient's record, he saw no evidence that Dr. Healey ever documented his recommendation that the patient skip these final treatments.

### Defendants Escalated Their Retaliation Against Dr. Doe

76.     On August 2, 2019, Ms. Wiggin falsely accused Dr. Doe of stealing an MGMC iPhone charger and replacing it with an old broken one. She slammed a door in Dr. Doe's face when he tried to respond. Dr. Doe reported this incident to Debbie Bowden, the Cancer Program Administrator and Administrative Director of Oncology Services.

77.     On August 19, 2019, MGMC, through Ms. Bowden, directed Dr. Healey in writing that Dr. Doe "can not work" until further notice.

78.     On August 20, 2019, MGMC banned Dr. Doe from working at MGMC or even being on the hospital premises.

79.     Dr. Doe was permanently restricted from providing patient care and from even entering the hospital campus without a security escort. This ban was based on a facially bogus report by an MGMC employee that Dr. Doe had threatened her with a pair of scissors on the morning of August 15, 2019. The same MGMC employee had continued to work closely with Dr. Doe throughout the day on August 15, after the supposed scissor incident.

80.     MGMC never interviewed Dr. Doe about these claims or gave him the opportunity to explain what had happened.

81.     MGMC interview notes about the August 15 incident include the following:

> I asked how things were going today as she had been working with Dr. [Doe]. She said it was going "ok."
> She spoke to him about the weather and he had responded -I know you ordered up the rain- and then looked at her with a "crazy look" in his eyes. I asked her what that looks like (mad/sad/angry?). She said he was "purposely trying to look like a crazy person."

82.     The complaining employee also told MGMC "what if we are in danger? He comes to work with a lot of bags, what are in those bags?" Dr. Doe regularly carried bags to transport paperwork between his home and the hospital.

83.     On August 20, 2019, MGMC's general counsel emailed Dr. Healey and his attorney that Dr. Doe was not allowed on hospital grounds without security personnel and that he must return his keys and badge access immediately.

84.     As a result of MGMC's abrupt adverse actions against him, Dr. Doe was forced to disappear with no explanation to his patients, MGMC personnel, referring physicians from other practices in Maine, twice-a-week MGMC Tumor Board attendees, colleagues from monthly and quarterly tumor boards of other hospitals in Maine who had relied on his analyses and recommendations for their patients, and to the staff of Jackson Laboratory, located on the premises of MGMC.

24

85. Dr. Doe's abrupt departure was particularly damaging to his professional reputation because it had previously been announced that his last day of work would be October 18, 2019.

86. On August 26, 2019, MGMC's general counsel emailed Dr. Doe's attorney that he was not under "investigation" at MGMC.

87. On December 2, 2019, Dr. Doe learned that Dr. Healey falsely told a prospective employer that Dr. Doe was under investigation by MGMC.

88. On January 23, 2020, Dr. Doe learned that his privileges had not been approved for a locum assignment in Wisconsin. The agent who made the locum arrangements told him that she had never before had an assignment fall through at the last minute like this one had. Dr. Doe's agent relayed that someone told her that Dr. Doe's "status was not clear."

89. Based on Dr. Healey's false statements to a prospective employer in December 2019, Dr. Doe reasonably inferred that Dr. Healey or MGMC relayed false information to this prospective employer in Wisconsin.

90. Between August 2019 and December 2022, Dr. Doe lost other advantageous job opportunities because of damage to his professional reputation caused by the circumstances of his abrupt departure from MGMC and bad job references relating to his employment at MGMC.

91. Defendants acted with malice or with reckless indifference to Dr. Doe's protected civil rights under federal and state law.

25

## Administrative Exhaustion

92.     On February 11, 2020, Dr. Doe filed an employment discrimination complaint against the Defendants with the Maine Human Rights Commission and the U.S. Equal Employment Opportunity Commission alleging discrimination because of race, color, ancestry and national origin; interference; and retaliation for reporting the same.

93.     On March 18, 2022, the Maine Human Rights Commission dismissed Dr. Doe's complaint under 5 M. R. S. § 4612(2).

94.     On May 12, 2022, the U.S. Equal Employment Opportunity Commission issued a Notice of Right to Sue to Dr. Doe.

95.     Under 5 M.R.S. § 4622, Dr. Doe has satisfied one or more of the prerequisites to be awarded attorney's fees and all available damages under the Maine Human Rights Act.

96.     Dr. Doe has exhausted all administrative remedies for all claims in this action that require administrative exhaustion.

## Legal Claims

## Count I

## Race Discrimination and Retaliation for
## Opposing and Reporting Race Discrimination

97.     The above allegations are realleged.

98.   MGMC, Dr. Healey, and ROA discriminated against Dr. Doe because of his race, ancestry, ethnic characteristics, and color, and retaliated against him for reporting and opposing what he reasonably believed were violations of his rights under state and federal anti-discrimination laws, in violation of 42 U.S.C. § 1981, Title VII of the Civil Rights Act of 1964, and the Maine Human Rights Act, including when they created a hostile work environment, constructively discharged him, terminated his employment, barred him from the hospital premises, effectively terminated his medical staff privileges with no due process, and gave negative professional references about him and bad-mouthed him to prospective employers.

99.   Defendants' failure to promptly investigate Dr. Doe's reports about workplace discrimination also make them liable under these laws.

100.   Plaintiff is pursuing all possible methods of proving discrimination and retaliation, including but not limited to, circumstantial and direct evidence, pretext evidence, evidence of deviation from applicable rules or practices, implicit or unconscious bias, as well as causation based on a determining factor even though other, non-discriminatory factors were determining factors.

101.   As a direct and proximate result of Defendants' intentional retaliation against Plaintiff, he has suffered and will continue to suffer

damages, including, but not limited to, lost wages and benefits, loss of self-confidence and purpose, emotional distress, humiliation and embarrassment, financial distress, emotional pain and distress, suffering, inconvenience, mental anguish, loss of enjoyment of life, injury to reputation, injury to career, deprivation of professional and career opportunities, and other pecuniary and non-pecuniary losses.

## Count II

## Maine Whistleblowers' Protection Act

102.   The above allegations are realleged.

103.   Defendants retaliated against Dr. Doe for reporting what he reasonably believed (1) were unsafe conditions and practices that created the risk of serious injuries to patients and (2) were adverse working conditions that violated federal and state anti-discrimination laws. This retaliation violated the Maine Whistleblowers' Protection Act (MWPA), including when Defendants created a hostile work environment, constructively discharged him, terminated his employment, barred him from the hospital premises, effectively terminated his medical staff privileges with no due process, and gave negative professional references about him and bad-mouthed him to prospective employers.

104.   Defendants' failure to promptly investigate Dr. Doe's complaints of whistleblower retaliation also make them liable under the MWPA.

105.   As a direct and proximate result of Defendants' intentional retaliation against Plaintiff, he has suffered and will continue to suffer damages, including, but not limited to, lost wages and benefits, loss of self-confidence and purpose, emotional distress, humiliation and embarrassment, financial distress, emotional pain and distress, suffering, inconvenience, mental anguish, loss of enjoyment of life, injury to reputation, injury to career, deprivation of professional and career opportunities, and other pecuniary and non-pecuniary losses.

## Count III

## MHRA Interference

106.   The above allegations are realleged.

107.   Defendants interfered with Dr. Doe's exercise and enjoyment of the rights granted and protected by the MHRA and otherwise violated the prohibitions in 5 M.R.S.A. § 4633.

108.   Defendants interfered with Dr. Doe's right to work free from race discrimination and discrimination because of his color, national origin, and ancestry, when it created a hostile work environment, constructively discharged him, terminated his employment, barred him from the hospital premises, effectively terminated his medical staff privileges with no due

process, and gave negative professional references about him and bad-mouthed him to prospective employers.

109.   Defendants interfered with Dr. Doe's right to work free from retaliation for reporting what he reasonably believed were risks to patient safety when it created a hostile work environment, constructively discharged him, terminated his employment, barred him from the hospital premises, effectively terminated his medical staff privileges with no due process, and gave negative professional references about him and bad-mouthed him to prospective employers.

110.   As a direct and proximate result of Defendants' intentional retaliation against Plaintiff, he has suffered and will continue to suffer damages, including, but not limited to, lost wages and benefits, loss of self-confidence and purpose, emotional distress, humiliation and embarrassment, financial distress, emotional pain and distress, suffering, inconvenience, mental anguish, loss of enjoyment of life, injury to reputation, injury to career, deprivation of professional and career opportunities, and other pecuniary and non-pecuniary losses.

## Count IV

### Tortious Interference with Contractual Relations

111.   The above allegations are realleged.

112.   Dr. Doe had a valid contract or prospective economic advantage with ROA, MGMC, and other prospective employers.

113.   Defendants interfered with that contract or advantage through fraud or intimidation. Among other things, MGMC procured a breach of contract by "making it clear" to Dr. Healey and ROA that they could avail themselves of the benefits of working with MGMC only if they breached their contract of employment with Dr. Doe.

114.   Defendants' interference proximately caused damages to Dr. Doe including, but not limited to, lost wages and benefits, loss of self-confidence and purpose, emotional distress, humiliation and embarrassment, financial distress, emotional pain and distress, suffering, inconvenience, mental anguish, loss of enjoyment of life, injury to reputation, injury to career, deprivation of professional and career opportunities, and other pecuniary and non-pecuniary losses.

## Request for Relief

115.   Plaintiff requests relief against Defendants as follows:

(a)   Enter Judgment in Plaintiff's favor;

(b)   Award Plaintiff back pay for lost wages and benefits and prejudgment interest thereon and promotion to positions wrongfully denied, or, in lieu thereof, front pay for future lost wages and benefits;

(c)     Award compensatory and punitive damages in amounts to be determined at trial by the jury and prejudgment interest thereon;

(d)     Award Plaintiff an amount to offset the state and federal taxes he will be required to pay for compensatory damages and any increased taxes he will have to pay because he has received a lump sum for lost wages, employment benefits, or other lost compensation;

(e)     Award Plaintiff full costs and reasonable attorney's fees including all reasonable case expenses;

(f)     Award Plaintiff nominal damages;

(g)     Award Plaintiff prejudgment interest; and

(h)     Award such further relief as is deemed appropriate.

Respectfully submitted,

Date: June 20, 2024

/ David G. Webbert
David G. Webbert
Johnson & Webbert, LLP
1 Bowdoin Mill Island, Suite 300
Topsham, ME 04086
Tel:  (207) 623-5110
dwebbert@work.law

*Attorney for Plaintiff*